UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

JEREMY P. GALLANT,
    Plaintiff,

Case No. 1:16-cv-00487

Barrett, J.
Litkovitz, M.J.

vs.

ANTHONY CADOGAN, et al.,
    Defendants.

**ORDER AND REPORT
AND RECOMMENDATION**

## I. Introduction

Plaintiff, an inmate at the Southern Ohio Correctional Facility (SOCF), brings this pro se

action under 42 U.S.C. § 1983 alleging violations of his civil rights under the First and Eighth

Amendments to the United States Constitution against defendants Dr. Ahmed, Deputy Warden

Cool, Lieutenant Frazie, Mr. Mead, Mr. Satterfield and Captain Whitman. This matter is before

the Court on (1) defendants' motion for summary judgment (Doc. 67) and supporting attachment

(Doc. 81), plaintiff's unopposed motion for leave to file a response that exceeds 20 pages (Doc.

86), plaintiff's response in opposition to defendants' motion (Doc. 87), and defendants' reply in

support of the motion for summary judgment (Doc. 91); and defendants' motion to strike non-

comporting declarations submitted in opposition to their motion for summary judgment (Doc.

92) and motion to strike plaintiff's response to defendants' reply (Doc. 94), both of which are

unopposed.

Plaintiff has been granted leave to proceed *in forma pauperis* in this matter on the

following claims:

1.  [Plaintiff's] first cause of action to the extent that plaintiff has alleged a claim
    against defendant [Dr. Faisal] Ahmed based on the failure to treat a broken
    bone and infection in plaintiff's right hand (First cause of action);

2. [A] claim against defendant Ahmed and unidentified "John/Jane Doe" defendants for assaulting plaintiff during a medical examination on March 9, 2015 (First cause of action);

3. [C]laims against a "John/Jane Doe" defendant for committing a retaliatory act by exposing plaintiff to a harmful chemical substance on July 2, 2015 (Second cause of action);

4. [Claims] against "John/Jane Doe" defendants who allegedly refused to provide medical treatment for injuries suffered in [the alleged chemical exposure] incident (Second cause of action);

5. [Claims] for [a]lleged "U.S. mail tamperings and obstructions" . . . brought against defendants [Mr.] Cool, [Lieutenant] Frazie, [Captain] Whittman, [Mr.] Mead, [Mr.] Satterfield, and "other unidentified state officials" (Fourth cause of action).

(Docs. 5, 51).

## II. Defendants' motions to strike (Docs. 92, 94)/Plaintiff's motion for leave to file excess pages (Doc. 86)

Plaintiff moves for leave to file a response in opposition to defendants' motion for summary judgment that exceeds 20 pages. (Doc. 86). The Court grants plaintiff leave to file the response.

Defendants move to strike from plaintiff's response several declarations of inmates who generally allege that plaintiff was denied medical treatment which plaintiff has submitted in opposition to defendants' motion for summary judgment. (Doc. 87 at 56-67). Defendants argue that the declarations do not comply with the requirements of 28 U.S.C. § 1746, which governs unsworn declarations under penalty of perjury. (Doc. 82). Section 1746 provides, "Whenever . . . . any matter is required or permitted to be supported, evidenced, established, or proved by the sworn declaration . . . in writing of the person making the same . . ., such matter may, with like force and effect, be supported, evidenced, established, or proved by the unsworn declaration . . . in writing of such person which is subscribed by him, as true under penalty of perjury, and dated,

in substantially the following form: . . . 'I declare . . . under penalty of perjury that the foregoing is true and correct. Executed on (date). (Signature).'" 28 U.S.C. § 1746.

The third-party declarations plaintiff has submitted do not comply with the requirements of § 1746. The individuals do not state that they are making the declarations "under penalty of perjury," and all but one of the declarations are not dated. Further, the declarations, which generally state that prison officials mistreated the declarant in some way or that they mistreated plaintiff, are either not relevant to plaintiff's claims or fall far short of substantiating plaintiff's allegations. The declarations are not made on personal knowledge of plaintiff's medical history and treatment, they do not set out facts that would be admissible in evidence, and they do not show that the affiant is competent to testify as to plaintiff's medical treatment. *See* Fed. R. Civ. P. 56(c)(4) ("An affidavit or declaration used to support or oppose a motion [for summary judgment] must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated."). The declarations are not competent evidence and the Court has not considered them in resolving the summary judgment motion.

Plaintiff's supplemental response to defendants' reply in support of their motion for summary judgment (Doc. 93) is not an appropriate filing. The Local Rules permit the filing of a motion, a response, and a reply, with no additional memoranda permitted except with leave of court for good cause shown. S.D. Ohio Civ. R. 7.2(a)(2). Plaintiff did not seek leave of Court to file a response to defendants' reply. The Court will therefore strike plaintiff's response to the reply.

### III. Defendants' motion for summary judgment (Doc. 67)

Defendants move for summary judgment on all claims for relief. (Doc. 67). They argue there is no genuine issue of material fact and that they are entitled to summary judgment as a matter of law. Defendants contend they are entitled to qualified immunity because the facts and documentary evidence show defendants did not exhibit deliberate indifference to plaintiff's medical needs; plaintiff does not have an actionable claim against defendants for mishandling or tampering with his mail; and there is no medical evidence or other support in the record for plaintiff's claim that an unknown person contaminated his cell with a chemical agent.

Plaintiff opposes defendants' motion for summary judgment and has submitted supporting documentation. (Doc. 87). In addition, plaintiff "affirm[s] under pains and penalty of perjury" to the truth of the complaint's contents. (Doc. 1-3 at 23). The Court therefore finds for summary judgment purposes that the amended complaint is verified and that its contents may be considered at the summary judgment stage. *See Williams v. Browman*, 981 F.2d 901, 905 (6th Cir. 1992); *see also El Bey v. Roop*, 530 F.3d 407, 414 (6th Cir. 2008) (a "verified complaint . . . carries the same weight as would an affidavit for purposes of summary judgment") (citing *Lavado v. Keohane*, 992 F.2d 601, 605 (6th Cir. 1993)). Nonetheless, the amended complaint does not create an issue of fact as to whether Dr. Ahmed was deliberately indifferent to plaintiff's serious medical needs, whether plaintiff was intentionally exposed to and harmed by a chemical substance in retaliation for filing a lawsuit, or whether defendants violated plaintiff's First Amendment rights by tampering with his mail. Thus, for the reasons discussed herein, summary judgment should be granted in defendants' favor.

## A. Summary judgment standard

A motion for summary judgment should be granted if the evidence submitted to the Court demonstrates that there is no genuine issue as to any material fact, and that the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986). The Court must evaluate the evidence, and all inferences drawn therefrom, in the light most favorable to the non-moving party. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio*, 475 U.S. 574, 587 (1986); *Little Caesar Enters., Inc. v. OPPC, LLC*, 219 F.3d 547, 551 (6th Cir. 2000).

The trial judge's function is not to weigh the evidence and determine the truth of the matter but is to determine whether there is a genuine factual issue for trial. *Anderson*, 477 U.S. at 249; *Little Caesar Enterprises, Inc.*, 219 F.3d at 551. The trial court need not search the entire record for material issues of fact, *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1479-80 (6th Cir. 1989), but must determine "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson*, 477 U.S. at 251-52. "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'" *Matsushita*, 475 U.S. at 587. "When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." *Scott v. Harris*, 550 U.S. 372, 380 (2007). However, "[f]acts that are not blatantly contradicted by [the evidence] remain entitled to an interpretation most favorable to the non-moving party." *Coble v. City of White House, Tenn.*, 634 F.3d 865, 870 (6th Cir. 2011).

Because plaintiff is a pro se litigant, his filings are liberally construed. *Spotts v. United States*, 429 F.3d 248, 250 (6th Cir. 2005) (citing *Haines v. Kerner*, 404 U.S. 519, 520 (1972) (stating that the Court holds pleadings of pro se litigants to less stringent standards than formal pleadings drafted by lawyers)); *Boswell v. Mayer*, 169 F.3d 384, 387 (6th Cir. 1999) (pro se plaintiffs enjoy the benefit of a liberal construction of their pleadings and filings). However, a party's status as a pro se litigant does not alter his duty to support his factual assertions with admissible evidence. *Maston v. Montgomery Cty. Jail Med. Staff Pers.*, 832 F. Supp.2d 846, 851-52 (S.D. Ohio 2011) (citing *Viergutz v. Lucent Techs., Inc.*, 375 F. App'x 482, 485 (6th Cir. 2010)). When opposing a motion for summary judgment, a pro se party cannot rely on allegations or denials in unsworn filings. *Id.* (citing *Viergutz*, 375 F. App'x at 485).

## B. Claims brought against defendants in their official capacity

To the extent plaintiff sues defendants in their official capacity, defendants are entitled to summary judgment on plaintiff's claims. The Eleventh Amendment bars a federal court from hearing a damages claim against a state and its entities except where Congress has explicitly abrogated a state's immunity to suit on the face of a statute or where the state itself has consented to suit. *Edelman v. Jordan*, 415 U.S. 651 (1974). Congress did not abrogate state immunity to suit under 42 U.S.C. § 1983. *See Will v. Mich. Dept. of State Police*, 491 U.S. 58, 66-67 (1989); *Quern v. Jordan*, 440 U.S. 332, 340 (1979). Further, the State of Ohio has not waived its Eleventh Amendment immunity in the federal courts. *See Johns v. Supreme Court of Ohio,* 753 F.2d 524 (6th Cir. 1985). A suit against defendants in their official capacity would, in reality, be a way of pleading the action against the entity of which defendants are agents, i.e., the State of Ohio. *See Monell v. New York City Dept. of Soc. Servs.*, 436 U.S. 658, 690 (1978). Thus, actions against state officials in their official capacity are included in this bar. *Will v. Michigan Dept. of State*

*Police*, 491 U.S. 58, 70-71 (1989). Therefore, defendants in their official capacities are immune from a suit for damages under the Eleventh Amendment. *Barker v. Goodrich*, 649 F.3d 428, 433 (6th Cir. 2011). *See also Thiokol Corp. v. Dept. of Treasury, State of Mich.*, 987 F.2d 376, 381 (6th Cir. 1993) (noting that the Eleventh Amendment "also bars suits for monetary relief against state officials sued in their official capacity"). Accordingly, plaintiff's damages claim against all defendants in their official capacities should be dismissed.

### C. Eighth Amendment claims for deliberate indifference

#### i. The Eighth Amendment

To establish a violation of his Eighth Amendment rights resulting from a denial of medical care, plaintiff must show that defendants were deliberately indifferent to his serious medical needs. *Estelle v. Gamble*, 429 U.S. 97, 106 (1976); *Brooks v. Celeste*, 39 F.3d 125, 127 (6th Cir. 1994). A constitutional claim for denial of medical care has objective and subjective components. *Farmer v. Brennan*, 511 U.S. 825, 834 (1994); *Napier v. Madison Cty.*, 238 F.3d 739, 742 (6th Cir. 2001). The objective component requires that the deprivation be "sufficiently serious." *Farmer*, 511 U.S. at 834. A medical need is "sufficiently serious" if it either "has been diagnosed by a physician as mandating treatment" or "is so obvious that even a lay person would easily recognize the necessity for a doctor's attention." *Gunther v. Castineta*, 561 F. App'x 497, 499 (6th Cir. 2014) (quoting *Harrison v. Ash*, 539 F.3d 510, 518 (6th Cir. 2008)).

The subjective component requires an inmate to show that prison officials had "a sufficiently culpable state of mind" in denying medical care. *Farmer*, 511 U.S. at 834. Plaintiff must show that defendant was aware of facts from which he could draw the inference that a substantial risk of serious harm existed, and that the defendant actually drew that inference. *Gunther*, 561 F. App'x at 500 (citing *Harrison*, 539 F.3d at 518). "Knowledge of the asserted

serious needs or of circumstances clearly indicating the existence of such needs, is essential to a finding of deliberate indifference." *Horn v. Madison Cty. Fiscal Court*, 22 F.3d 653, 660 (6th Cir. 1994). Thus, to prove the subjective component, plaintiff must show that defendants subjectively knew of and disregarded a serious risk to his health by showing they both (1) were aware of facts from which an inference could be drawn that a substantial risk of harm to him existed, and (2) defendants consciously disregarded that risk. *Farmer*, 511 U.S. at 837. The Sixth Circuit distinguishes between Eighth Amendment claims alleging a complete denial of medical care and those contesting the adequacy of medical care actually received. *Alspaugh v. McConnell*, 643 F.3d 162, 169 (6th Cir. 2011). Courts are generally reluctant to second guess the medical judgments of doctors and where a prisoner receives treatment for his medical condition, he must show that the treatment was "so woefully inadequate as to amount to no treatment at all." *Id.* (quoting *Westlake v. Lucas*, 537 F.2d 857, 860 n.5 (6th Cir. 1976)).

To establish deliberate indifference, a plaintiff must show more than mere negligence or the misdiagnosis of an ailment. *Id.* Deliberate indifference describes a state more blameworthy than negligence. *Farmer*, 511 U.S. at 835. A prisoner "must allege acts or omissions sufficiently harmful to evidence deliberate indifference to serious medical needs." *Estelle*, 429 U.S. at 106. Allegations of negligence in diagnosing or treating medical conditions are not actionable under 42 U.S.C § 1983. *Id.*; *Byrd v. Wilson*, 701 F.2d 592, 595 n.2 (6th Cir. 1983). An allegation of inadvertent failure to provide adequate medical care or of a negligent diagnosis simply fails to state a cause of action. *Selby v. Martin,* 84 F. App'x 496, 499 (6th Cir. 2003). A prison official is liable for denying humane conditions of confinement, including proper medical care, in violation of the Eighth Amendment prohibition on cruel and unusual punishment only if "he knows that inmates face a substantial risk of serious harm and disregards that risk by failing

to take reasonable measures to abate it." *Farmer*, 511 U.S. at 847.

A convicted prisoner's right to be free from the use of excessive force by prison officials is also governed by the Eighth Amendment. *Whitley v. Albers*, 475 U.S. 312, 327 (1986)). An Eighth Amendment excessive force claim has both an objective and subjective component. *Cordell v. McKinney*, 759 F.3d 573, 580 (6th Cir. 2014) (citing *Santiago v. Ringle*, 734 F.3d 585, 590 (6th Cir. 2013)). The subjective component focuses on "whether force was applied in a good faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm." *Id.* (quoting *Hudson v. McMillian*, 503 U.S. 1, 7 (1992)). In making this inquiry, the Court should consider the need for the use of force, the relationship between that need and the type and amount of the force used, the threat reasonably perceived by the official, the extent of the injury inflicted, and any efforts made to temper the severity of a forceful response. *See Hudson*, 503 U.S. at 7; *Whitley*, 475 U.S. at 319-21. The inmate is not required to suffer a serious injury, but the extent of his injuries may be considered in determining whether the force used was wanton and unnecessary. *Hudson*, 503 U.S. at 7.

The objective component requires the "pain inflicted to be 'sufficiently serious'" to offend "contemporary standards of decency." *Cordell*, 759 F.3d at 580 (quoting *Williams v. Curtin*, 631 F.3d 380, 383 (6th Cir. 2011); *Hudson*, 503 U.S. at 8). "While the extent of a prisoner's injury may help determine the amount of force used by the prison official, it is not dispositive of whether an Eighth Amendment violation has occurred." *Id.* at 580-81 (citing *Wilkins v. Gaddy*, 559 U.S. 34, 37 (2010)). "When prison officials maliciously and sadistically use force to cause harm, contemporary standards of decency always are violated . . . [w]hether or not significant injury is evident. Otherwise, the Eighth Amendment would permit any physical

punishment, no matter how diabolic or inhuman, inflicting less than some arbitrary quantity of injury." *Id.* at 581 (quoting *Hudson*, 503 U.S. at 9).

### ii. Eighth Amendment claims against Dr. Ahmed

Defendant Dr. Ahmed moves for summary judgment on plaintiff's claims that he demonstrated deliberate indifference to plaintiff's serious medical needs by (1) failing to treat a broken wrist, infection, and loss of function in plaintiff's right hand, and (2) assaulting plaintiff during an infirmary visit on March 9, 2015. (Doc. 67).

Plaintiff makes the following allegations in his verified complaint related to these claims: Plaintiff sustained a broken metacarpal bone along the right thumb-wrist area on March 3, 2015 at SOCF. (Doc. 1-3 at 7). Plaintiff alleges that "numerous state officials and medical staff" who were informed of his injury and pain completed disregarded his pain and requests for medical treatment. (*Id.*). He alleges that at some point x-rays were taken which confirmed the broken bone, and on March 9, 2015, he was notified he would be meeting with Dr. Ahmed. (*Id.* at 8). On March 9, 2015, plaintiff attended a physical examination with Dr. Ahmed. A confrontation occurred during the examination and plaintiff was "assaulted" by both Ahmed and unidentified state officials. (*Id.*). Plaintiff alleges that state officials revised the incident report to make it appear that plaintiff was the aggressor. (*Id.* at 9).

Plaintiff claims his injuries went untreated from March 3 to 17, 2015, at which time plaintiff was transported to Franklin Medical Center (FMC). Plaintiff underwent surgery and three pins were inserted into his broken hand on March 18, 2015, at Ohio State University Medical Center (OSUMC). Plaintiff claims that Dr. Ahmed showed disregard for his right hand after his return to SOCF, which caused plaintiff pain, a gross infection, inflammation, swelling in the hand, and a foul-smelling discharge. On or around May 18, 2015, plaintiff was transferred to

OSUMC for an emergency visit. The attending physician made written recommendations for unspecified, necessary treatment. Plaintiff alleges that upon returning from OSUMC, Dr. Ahmed refused plaintiff all medical treatment and his hand is permanently disfigured as a result. (*Id*.).

Dr. Ahmed has submitted into evidence his affidavit, medical records related to plaintiff's wrist and right-hand condition, and medical and disciplinary records related to the March 9, 2015 infirmary visit. Dr. Ahmed's evidence supports the following facts: Laura Hart, R.N., completed a Medical Exam Report for an examination of plaintiff on March 3, 2015, following a fight. (Doc. 67, Exh. B, p. 1). According to the medical record, plaintiff reported, "I'm okay, no injuries." He "refused vitals." All objective physical findings were normal. The nurse assessed plaintiff as having no injuries and needing no treatment. The following day, March 4, 2015, plaintiff was assessed by Teresa Hill, R.N. (*Id*., pp. 2-3). Plaintiff reported that he had slipped and fallen in his cell at 3:30 a.m., he tried to brace himself, and he banged his hand and knee. Plaintiff had restricted range of motion and swelling of the right hand and thumb, a skinned area on the right outer thumb, and a small open area on the right first finger that was scabbed. Plaintiff also had a golf-ball sized bump on the right knee and a small bruised area above the knee cap. Plaintiff was treated with Mediproxen, Ace wraps, and ice. Plaintiff was advised to apply ice and return to the medical clinic in seven days if there was no improvement. He was referred to an advanced level provider (ALP) and for x-rays by Nurse Hill and Dr. Ahmed. (*Id*., p. 4). X-rays were taken at FMC on March 7, 2015 and read two days later. (*Id*., p. 6). Right hand x-rays disclosed an "[a]cute mildly displaced fracture first metacarpal base." (*Id*.). Right wrist x-rays disclosed a possible "fracture lunate without displacement," which the interpreting physician recommended be confirmed by an MRI or CT scan. (*Id*., p. 7). Right knee x-rays

were negative and joint spaces were normal. (*Id.*, p. 8). A follow-up appointment was scheduled with Dr. Ahmed. (*Id.*, pp. 7-8).

Dr. Ahmed's notes reflect that he saw plaintiff on March 9, 2015. (*Id.*, p. 9). Dr. Ahmed noted that "[plaintiff] got mouthy with officer" and was told to be quiet or he would be sent back to the housing unit; plaintiff "turned and charged" at Dr. Ahmed; plaintiff was restrained by Dr. Ahmed; and officers escorted plaintiff back to the housing unit. (*Id.*, p. 9; *see also* Doc. 67-5, Exh. D, Ahmed Affidavit, ¶ 29; Doc. 67-1, Exh. A, Ahmed Decl. ¶ 14). A conduct report was issued against plaintiff in connection with the incident, charging him with four rule infractions. (Doc. 67-4, Exh. D, p. 1). According to the conduct report, when plaintiff was let into the exam room for the doctor sick call visit with Dr. Ahmed, his voice because loud and aggressive and he started talking back to the officer, Officer Kelley, about his weight. When Dr. Ahmed told plaintiff to be quiet he yelled, "I can say what I want, Faisal Ahmed," "This is America, Faisal Ahmed, I can do what I want!" Dr. Ahmed ordered plaintiff to hold the noise down or the visit would be terminated, and plaintiff began yelling again. Dr. Ahmed advised Officer Kelley that the visit was terminated because of plaintiff's behavior, Officer Kelley opened the door to let plaintiff leave the exam room, and plaintiff then turned around and charged Dr. Ahmed, hitting Dr. Ahmed's face with his head. Dr. Ahmed diverted plaintiff away from his body and attempted to restrain him by keeping him subdued in the corner between the exam cage, the wall and Dr. Ahmed, while plaintiff repeatedly attempted to bite Dr. Ahmed's hands, arms and face. Officer Kelley and Dr. Ahmed moved plaintiff to the floor, where he continued to struggle until other officers responded to the scene, assisted plaintiff to his feet, and escorted him back to his cell. Nurse Hill examined Dr. Ahmed after the incident and noted a small open area with minimal bleeding to be treated with ice as needed. (*Id.*, p. 13). Dr. Ahmed reportedly suffered a

small cut and a sprain. (*Id.*, p. 19). Nurse Hill also examined plaintiff on March 9, 2015, immediately after the incident. (*Id.*, p. 17; *see also* Doc. 67-2, p. 10). She reported that plaintiff "Refused [vital signs]" after a fight and use of force event; he stood in the center of the cell and held his hands up in the air; he reported he had injures to his head, legs and hands; and he refused to expose his legs, arms or chest for an assessment. She reported that his skin was pink, he had a few superficial scratches to the back of the head, a few reddened areas on the neck, and the thumb and hand remained swollen from the prior week's episode. Plaintiff did not have his Ace wrap on and he was advised to put it back on and wash the scratches with soap and water and see the nurse as needed.

A Supervisor's Use of Force Summary Report (Doc. 67-4, Exh. D, pp. 3-4) was completed and Officer Kelley, responding officers Walter S. Sammons, Christopher Combs, and M. Barney, staff member Susan R. Felts, and Virginia Durham, LPN, prepared Incident Reports, all of which corroborated Dr. Ahmed's version of the incident. (*Id.*, pp. 6-11). Plaintiff refused to sign an Inmate Use of Force Statement. (*Id.*, p. 12). An Inmate on Staff Assault Report was also prepared. (*Id.*, pp. 19-20). Plaintiff refused to attend the hearing on the rules infractions charges, and the matter was referred to the Rules Infractions Board (RIB) on March 12, 2015. (*Id.*, pp. 21- 23).

On March 13, 2015, J. Jonson, CNP, and J. Brannigan, LPN, wrote an order for an orthopedic consultation "as soon as possible" and gave plaintiff a wrist brace and instructed him on the proper application. (Doc. 67-2, Exh. B, pp. 11-12, 15). Dr Ahmed signed off on a recommendation that an orthopedic consultation occur "as soon as possible." (*Id.*, p. 13). An appointment was scheduled for March 17, 2015. (*Id.*, p. 14). The notes reflect that while plaintiff could have had his surgery "tomorrow," surgery was contraindicated at that time

because plaintiff was on a hunger strike. (*Id.*, p. 16). Plaintiff agreed to come off of his hunger strike later that day and signed a consent form for surgery. (*Id.*, p. 18). The treatment records reflect plaintiff was "now off hunger strike" as of March 17, 2015, and he was sent to FMC for surgery on his thumb. (*Id.*, p. 17). Following surgery, he was given wound care instructions to leave the splint in place, keep it dry, and not remove it until his follow-up appointment. (*Id.*, p. 32). He was discharged to SOCF on March 19, 2015, and prescribed Tylenol #3 every 6 hours for 15 days and Baclofen twice a day for 14 days. (*Id.*, pp. 24, 32). On his return to SOCF from FMC, no signs of distress were noted and the splint on his right hand was noted to be intact. (*Id.*, p. 18). Nursing staff at SOCF observed plaintiff following his return and recorded their observations. (*Id.*, pp. 25-30).

Dr. Ahmed saw plaintiff on March 20, 2015 and signed off on the order for pain reliever. Dr. Ahmed noted he had discussed plaintiff's case with the Bureau of Medical Services (BOMS). Dr. Ahmed noted that when he saw plaintiff, he got "agitated and visibly violent" and yelled "I refuse everything," "I don't want to see medical," "I refuse all future medical." (Doc. 67-3, Exh. B, p. 12). Dr. Ahmed saw plaintiff on April 2, 2015, at which time plaintiff complained that he was not being taken care of and had drainage, and he thought he had an infection. (*Id.*, p. 3). Dr. Ahmed noted significant edema and mild erythema. An x-ray showed the pins were in place. The plan was to have the pins pulled, and plaintiff was prescribed oral antibiotics, Tylenol #3 for pain, and a removable thumb splint. Dr. Ahmed entered a consultation request for post-operation follow-up for plaintiff and an appointment was scheduled for April 9, 2015.

Plaintiff refused lab work against medical advice on April 3, 2017. (*Id.*, p. 16). X-rays were taken at FMC on April 6, 2015. (Doc. 67-2, Exh. B, p. 53). Plaintiff refused a nurse's assessment and a hunger strike vital sign assessment on April 7, 2015. (Doc. 67-3, Exh. B, pp. 2,

4). The records reflect that plaintiff stated, "I'm ok nurse, I don't want [to be] assessed. It won't help anyway." Plaintiff was advised to continue his medications and the RIB was informed of plaintiff's hunger strike. Plaintiff refused a vital sign assessment on April 8, 2015. (*Id.*, p. 20).

Plaintiff was seen in the FMC hand clinic on April 9, 2015. (*Id.*, pp. 4-5, 19). He reported that he had eaten and was no longer on a hunger strike. He was prescribed Bactrim and Tylenol #3 for three weeks as needed and placed in a hard cast. Plaintiff refused to be seen for "hand clinic MRT and hunger strike" on April 14, 2015. (*Id.*, p. 19). Plaintiff was on a hunger strike and refused blood pressure and vital sign assessments from April 15 through April 18, 2015. (*Id.*, pp. 7-9). On April 21, 2015, plaintiff refused a doctor sick call for review of the hand consult. (*Id.*, pp. 10-11).

On May 18, 2015, plaintiff was seen in the infirmary for wrist pain and a foul, putrid smell around his cast. (*Id.*, pp. 10, 21). A physician was consulted, the cast was removed, his hand was cleaned, and the pins were covered and wrapped. Plaintiff was diagnosed with an infection around the hardware and right thumb and was transported to the OSUMC emergency room by van for stabilization of the wrist. Plaintiff was diagnosed with post-operative pain. (*Id.*, pp. 22-26). Dr. Ahmed saw plaintiff the next day. (*Id.*, p. 27; Doc. 72-4, Exh. D, Ahmed Aff., ¶ 38). Dr. Ahmed noted that plaintiff apparently had no infection, he explained to plaintiff that he would be given Naprosyn and Tylenol #3 for pain treatment, and he would be referred to have the pins pulled. Dr. Ahmed noted that plaintiff had pulled out one of the pins while at OSUMC. Plaintiff was given notice of an appointment at the hand clinic on May 19, 2015. (Doc. 67-3, Exh. B, p. 28). Collegial review was performed and plaintiff was seen in the FMC hand clinic on June 4, 2015 and issued a splint for six weeks. (*Id.*, pp. 29, 33, 41).

Plaintiff was seen on June 8, 2015, after he complained that he fell in the shower and hurt his hand and wrist. (*Id.*, p. 30). The nurse noted his right hand was swollen, there was a small scab at the surgery site, but there was no drainage. Motrin was prescribed. (*Id.*, p. 35). X-rays disclosed a healed/healing fracture and no acute findings. (*Id.*, pp. 36-37). Plaintiff visited the infirmary on June 10, 2015. (*Id.*, p. 38). Dr. Ahmed noted plaintiff had an "obsession" with the idea that his hand was infected despite objective evidence to the contrary, and he complained that he was now unable to use his hand because he was not getting the treatment that he wanted. (*Id.*). Dr. Ahmed's plan was for testing, follow-up, and Non-Steroidal Anti-Inflammatory Drugs. (*Id.*, p. 39). Dr. Ahmed saw plaintiff for follow-up on June 23, 2015. (*Id.*, p. 42). When Dr. Ahmed saw plaintiff on July 23, 2015 for complaints about a chemical aroma, plaintiff verbalized no complaints about his thumb, pain medications, or other issues related to his wrist injury. (Doc. 67-3, Exh. B, p. 46).

In response to defendants' motion for summary judgment, plaintiff has submitted a declaration under 28 U.S.C. § 1746 categorically denying defendants' version of the facts and alleging that defendants have fabricated documents to support their allegations. (Doc. 87 at 11). Plaintiff also denies the following specific allegations which defendants make in their motion and claims the following supporting documents are fabricated:

- Plaintiff went to the infirmary on March 3, 2015 after a fight (*See* Doc. 67-2, Exh. B, p. 1) and he went to the infirmary and received treatment and a referral to an ALP on March 4, 2015 (*Id.*, pp. 2-3). Plaintiff has submitted a declaration stating the medical records for these dates are fabricated. (Doc. 87 at 26).

- There was a concern of a medical risk to plaintiff if he underwent surgery while on a hunger strike between March 12 and 16, 2015. (*See* Doc. 67 at 17, citing Doc. 67-2, Exh. B, pp. 16-17). Plaintiff alleges this is a false concern because surgery patients fast prior to a surgical procedure, and he asserts that relying on a hunger strike to deny treatment fails as a matter of law.

- The March 5, 2015 entry in Doc. 67-2, Exh. B, p. 4 lists the incorrect housing location for plaintiff and is therefore fabricated.

- Plaintiff was transferred to OSUMC for hand surgery on May 18, 2015. (Doc. 67-3, Exh. B, p. 5). Plaintiff notes that he was transported to the emergency room, which is reflected in the medical documentation.

Plaintiff has failed to produce evidence to show there is a genuine issue of material fact on his Eighth Amendment claim against Dr. Ahmed for deliberate indifference to plaintiff's medical needs. There is no dispute that plaintiff's fractured wrist is a sufficiently serious medical condition to meet the objective component of his Eighth Amendment claim against Dr. Ahmed. Nonetheless, the undisputed evidence of record establishes that defendant Ahmed is entitled to summary judgment as plaintiff fails to satisfy the subjective component of his Eighth Amendment deliberate indifference claim. The evidence proffered by defendant Ahmed overwhelmingly demonstrates that plaintiff received sustained medical treatment from Dr. Ahmed, nursing staff, and specialists for his wrist condition. Dr. Ahmed examined plaintiff multiple times between March 7 and July 2015. Dr. Ahmed ordered x-rays and referred plaintiff for consultations with hand specialists. Dr. Ahmed referred plaintiff to OSUMC for his initial consult and surgery and for a possible infection. Dr. Ahmed prescribed treatment which included pain medication, antibiotics and a splint on multiple occasions. Dr. Ahmed followed up with plaintiff after his referrals and after both of his surgeries to provide continuity of care. By introducing evidence to show he provided ongoing treatment to plaintiff for his serious medical needs, defendant Ahmed has satisfied his initial burden of production on summary judgment.

The burden thus shifts to plaintiff, as the non-moving party, to "present sufficient evidence from which a jury could reasonably find for him." *Jones v. Muskegon County*, 625 F.3d 935, 940 (6th Cir. 2010). Plaintiff has failed to carry his burden. Plaintiff has not presented evidence creating a genuine issue of fact as to whether Dr. Ahmed consciously disregarded any

risk to plaintiff's health based on his known medical condition. *Farmer*, 511 U.S. at 839, 844; *Loggins v. Franklin Cty., Ohio*, 218 F. App'x 466, 472 (6th Cir. 2007). Plaintiff has not cited to any record evidence to create a genuine issue of material fact on this matter. Instead, plaintiff relies upon conclusory and wholesale denials in his response to defendants' motion. Plaintiff makes few specific allegations and instead asks the Court to wade through the documents he has submitted to find evidence that contradicts defendants' allegations and supports plaintiff's claim of deliberate indifference. It is not the Court's burden on summary judgment to "comb through the record to ascertain whether a genuine issue of material fact exists." *Cacevic v. City of Hazel Park*, 226 F.3d 483, 492 (6th Cir. 2000) (citing *Guarino v. Brookfield Twp. Trs.*, 980 F.2d 399, 407, 410 (6th Cir. 1992)).

Plaintiff does not dispute that he received treatment from Dr. Ahmed for his broken wrist and ensuing complications. The record shows that Dr. Ahmed ordered x-rays which were taken on March 7, 2015, and Dr. Ahmed followed up with plaintiff on March 9, 2015, after the x-rays had been read. Plaintiff's dispute appears to be with the promptness of the treatment and the adequacy of treatment he received. Plaintiff asserts in the complaint that following his wrist injury, he relayed his injury, complaints of pain and need for medical treatment to unnamed "state officials and medical staff," all of whom "completely disregarded plaintiff's agonizing pain and desperate pleas for medical treatment." (Doc. 1-3 at 7). Plaintiff asserts that it was not until after he initiated a hunger strike that he received medical treatment. (*Id.* at 7-8). Plaintiff alleges that Nurse Hill fabricated records dated March 3 and 4, 2015, and he in fact did not go to the infirmary and did not receive treatment on those dates as the records indicate but instead stayed in his cell. (Doc. 87 at 7, citing Doc. 67-2, Exh. B, pp. 1-4). However, even accepting these allegations as true, they do not show that Dr. Ahmed was aware of plaintiff's injury and his

need for treatment between the date of the injury and the time Dr. Ahmed ordered x-rays on March 4, 2015 and followed up with plaintiff on March 9, 2017 following x-rays. Absent any evidence that Dr. Ahmed was aware of plaintiff's injury and need for treatment prior to that time, the evidence does not permit a finding that Dr. Ahmed showed deliberate indifference to plaintiff's serious medical needs by delaying treatment for his injury.

Further, plaintiff's allegation that Dr. Ahmed was deliberately indifference to his serious medical needs subsequent to March 7, 2015 amounts to nothing more than a difference of opinion between plaintiff and Dr. Ahmed as to the appropriateness of his treatment. The law is clear that "[w]here a prisoner has received some medical attention and the dispute is over the adequacy of the treatment, federal courts are generally reluctant to second guess medical judgments and to constitutionalize claims that sound in state tort law." *Graham*, 358 F.3d at 385 (quoting *Westlake*, 537 F.2d at 860 n.5). A doctor's failure to provide a specific treatment does not state a constitutional claim of deliberate indifference. *Mabry v. Antonini*, 289 F. App'x 895, 902 (6th Cir. 2008). The record shows that plaintiff received extensive treatment from Dr. Ahmed, specialists, and other medical staff for his injury and complications. Plaintiff was transferred to OSUMC for hand surgery twice on March 17, 2015 and May 18, 2015 and he received follow-up care. It is not clear what additional treatment plaintiff feels was appropriate in his case. Plaintiff has not produced any evidence to support a finding that Dr. Ahmed was deliberately indifferent to his serious medical needs.

Plaintiff also claims that Dr. Ahmed and unidentified defendants violated his Eighth Amendment rights by assaulting him during the medical appointment on March 9, 2015. Plaintiff has not produced evidence to show that Dr. Ahmed violated his Eighth Amendment rights in this manner. The objective component of this claim is not satisfied. Plaintiff has not

produced evidence to show he suffered pain or injury beyond some superficial scratches and a reddened area on his neck. Plaintiff cannot establish an Eighth Amendment claim premised on the alleged assault.

### iii. July 2, 2015 chemical exposure incident

In the complaint, plaintiff asserts that he was subjected to a campaign of harassment by unidentified state officials. (Doc. 1-3 at 10). Plaintiff alleges that he was jarred awake between 2:30 and 3:30 a.m. on the morning of July 2, 2015 by a strange noise and a very potent chemical aroma, as well as an unidentified state employee stating, "That will teach you to sue Ms. Clagg." (*Id.*). Plaintiff notes he had previously sued Rosie Clagg, an SOCF staff member who is married to Captain Clagg in security. Plaintiff alleges that the toxic chemical odor stayed with him for over 48 hours, which caused breathing complications and severe coughing. (*Id.* at 10-11). Plaintiff asserts that as he knows his own body, he became convinced that an unknown state employee had administered an unknown toxic chemical agent. Plaintiff immediately sought emergency medical treatment by submitting a "Health Service Request, Institutional Correspondence" and utilizing the grievance procedure. Plaintiff contends that all responsible state individuals who were notified disregarded the matter and denied an investigation and medical treatment. Plaintiff claims that on August 2, 2015, due to the suffocating symptoms and breathing complications, he had to be transferred on an emergency basis to the SOCF medical infirmary. He alleges that the attending medical staff disregarded the chemical exposure when plaintiff brought it to their attention, and an unidentified medical staff member refused plaintiff medical treatment. Plaintiff alleges that he continues to suffer breathing complications from the chemical exposure, and medical staff and state officials refuse to provide plaintiff treatment and testing. (*Id.* at 12).

Defendants move for summary judgment on plaintiff's Eighth Amendment claim that he was intentionally exposed to an unknown chemical substance on July 2, 2015, in retaliation for filing a lawsuit against Ms. Clagg. (Doc. 67). Defendants move for the dismissal of any "John Doe" or "Jane Doe" defendants for failure to prosecute because plaintiff has not identified and served these defendants. (Doc. 67 at 11-12, n. 2, 4). Defendants also move for summary judgment on plaintiff's claim on the merits. Defendants argue that there is no medical documentation of a chemical contamination, plaintiff admitted in one report that the claims may be in his head, and plaintiff was medically assessed as malingering or delusional. Defendants have introduced medical records and other documents to show there is no genuine issue of material of fact on this claim and that they are entitled to summary judgment as a matter of law.

Defendants' version of facts on this claim is as follows: Plaintiff was referred to Mental Health Services by Nurse Hill on July 7, 2015, after complaining that he thought he was being poisoned and that someone was releasing a chemical into his cell. (Doc. 67-3, Exh. B, p. 45). Plaintiff complained about smelling a "chemical aroma in [his] nose on a daily basis in his cell, every day since 7/1/15; feels as if phlegm in lungs is blocking his airway." (*Id*., p. 46). Plaintiff complained of feeling short of breath when he smelled the aroma and sharp pains. Dr. Ahmed offered to listen to plaintiff's lungs, but plaintiff refused an examination and told Dr. Ahmed, "I don't want you examining me, I don't want you treating me either." Dr. Ahmed noted that plaintiff was very fidgety and restless, and he verbalized probable hallucinations. On July 3, 2015, plaintiff made a Health Services Request to be seen immediately because he believed he had been "poisoned by vindictive state employees - I keep smelling chemical when I breath [sic] in, within my lungs and my chest is hurting. I am scared that some sort of chemical has been ingested or inhaled. Also my right hand is in constant pain along with my back." (Doc. 67-6,

Exh. E, p. 2). Plaintiff alleged that the medical department and Dr. Ahmed refused to treat him. Plaintiff submitted another request on July 6, 2015, complaining that his lungs felt like they were failing, he could not breathe, and he felt as though he was slowly suffocating. (*Id.*, p. 3). A nursing assessment was performed on July 6 and 7, 2015. (*Id.*, pp. 4-5). No complaints about plaintiff's lower or upper extremities were reported. Plaintiff reported that he had experienced a bad taste in his mouth for several days, he thought he had been poisoned, and it "smells like a cigarette." Plaintiff was referred to Mental Health Services for paranoia. (*Id.*, pp. 5-6). Nurse Hill assessed plaintiff for complaints of chest pain on July 14, 2015. (*Id.*, pp. 11-12). The nurse reported he was very talkative, his respiration was easy, he had no complaints of pain on palpation, and he still believed he had been poisoned. Plaintiff was assessed as healthy with noncardiac/atypical chest pain. He was prescribed antacids, and a doctor's sick call referral was noted to be pending.

Nurse J. Reiter, R.N., saw plaintiff in the infirmary on August 2, 2015 for a respiratory complaint. (*Id.*, p. 13). Plaintiff complained that he felt like he was suffocating and could not get oxygen. Nurse Reiter was unable to obtain a Peak Expiratory Flow Reading because plaintiff refused to cooperate. He was assessed with "'trouble breathing' [related to] anxiety" and was referred to Mental Health Services. Nurse Reiter reported in the assessment that plaintiff continually stated, "I am suffocating, I am being poisoned, there are people that want me dead, they're poisoning my cell," but she had observed no respiratory distress or difficulty. (*Id.*, p. 14). Plaintiff was sent to FMC for a chest x-ray on August 3, 2015, which was essentially within normal limits. (*Id.*, p. 19).

Plaintiff refused to be seen in doctor's sick call on September 8, 2015. (Doc. 67-3, Exh. B, p. 50). Plaintiff was examined after a fight on November 15, 2015, at which time his

respiration was easy, no injury was found, and no treatment was required. (Doc. 67-6, Exh. E, p. 17). Plaintiff was seen in the infirmary on November 30, 2015 for an initial hunger strike assessment. (Doc. 67-3, Exh. B, p. 50). The nurse reported that he was ambulatory without difficulty or dizziness and his respirations were even and unlabored. Plaintiff refused to come to the infirmary for a doctor's sick call visit on December 1, 2015, and he refused to allow his vital signs to be taken on December 2 and 3, 2015. (Doc. 67-3, Exh. B, p. 51). Plaintiff's hunger strike ended on December 3, 2015, when he was discovered eating an orange. Plaintiff was medically assessed after being transported to SOCF from another institution on December 11, 2015, and he was currently on a hunger strike but denied any complaints. (*Id.*, Doc. 67-3, Exh. B, pp. 52-53). His respiration was easy. Plaintiff was examined after he "was sprayed" on December 12, 2015. (Doc. 67-6, Exh. E, p. 18). He reported his face and eyes were burning but everything else was "ok," no distress was noted on visual examination, his breathing was normal, and he was assessed as healthy. Plaintiff denied any shortness of breath, pain or other concerns when seen three weeks into a hunger strike on December 28, 2015. (*Id.*, p. 26).

On June 10, 2016, plaintiff submitted a Health Services Request to be seen by a doctor for a "wide array of physical complications," including "breathing problems . . . untreated injuries and deformities, internal pains, headaches, - and some type of infection in my left wrist." (*Id.*, p. 1). Plaintiff wrote that he "attempted to relay such to the last medical professional, but was - - dismissed." (*Id.*). When examined on June 12, 2016, plaintiff complained that he kept "getting these weird chemical odors/smells and chest hurts sporadically when breathing and sharp pains." (*Id.*, p. 29). His lungs were clear on examination and the respiratory assessment was normal. On a doctor's sick call visit on June 15, 2016, plaintiff complained of a left wrist infection and trouble breathing, he reported that he used to be paralyzed and "last summer he

breathed in toxic chemicals in his sleep and had a vision of someone saying 'they're out to get you,'" but his responses were inconsistent, he laughed several times during the interview, and he did not appear to be in any distress. (*Id.*, p. 31). He was assessed as having a normal physical exam and malingering. (*Id.*, p. 32).

On August 16, 2016, plaintiff claimed to experience multiple medical issues and to have submitted three Health Service Requests without being seen. (*Id.*, p. 33). Plaintiff stated he was intentionally being exposed to some type of chemical substance in his cell, his health was deteriorating, and he had personally witnessed "unidentifiable state officials spraying chemicals from the pipe chase." The action was referred to Mental Health Services due to the nature of the accusation. Plaintiff was seen by a nurse on that same date and complained of neck pain and a sore throat. He was issued cough drops and Mediproxen and advised that salt water gargle was available. (*Id.*, p. 34). On August 25, 2016, plaintiff complained of many of the same issues as well as electric shocks going up the neck into the brain, occasional episodes of difficulty breathing, skipped heart beats, green urine, and a past episode of paralysis, which he thought his problems were related to. (*Id.*, p. 36). Plaintiff reported that he worked out "all the time." His physical examination was normal, a urine dip was normal, and plaintiff was assessed as malingering. (*Id.*, p. 37). Plaintiff was advised that his complaints could be related to his mental health, and it was noted that the mental health service was following him and it appeared he would be starting medications at some point. Plaintiff reportedly voiced his appreciation for the physical evaluation, and he admitted his symptoms could be in his head and he now felt better. There is no documentary evidence showing that plaintiff complained about or sought medical treatment for respiratory complaints after this date.

Defendants are entitled to summary judgment on plaintiff's claim that defendants deliberately exposed him to a chemical substance and refused to provide medical treatment for the injuries he allegedly suffered in the incident. Plaintiff has not presented evidence to create a material factual dispute as to (1) whether a defendant deliberately exposed plaintiff to a chemical agent, (2) whether the chemical agent resulted in a sufficiently serious medical condition, and (3) whether a defendant showed deliberate indifference to plaintiff's serious medical needs resulting from the chemical exposure. There is no evidence to show that any individual at SOCF deliberately exposed plaintiff to a toxic chemical substance. Plaintiff surmises that this occurred because he awoke to a strong chemical smell one night, he claims he heard a voice saying the release of the chemical was in retaliation for his lawsuit against Ms. Clagg, and he suffered symptoms for which he sought medical treatment. However, plaintiff has produced no evidence to show that he actually was exposed to a chemical agent, that the chemical agent was a "toxic" agent, that exposure to the chemical agent caused injury to him, and who exposed him to the chemical agent. Further, there is ample documentary evidence that shows plaintiff received medical care in response to his complaints of breathing difficulty. Plaintiff was examined multiple times in response to his complaints, a lung x-ray was taken which produced essentially normal findings, and lung function testing was performed. Medical providers determined that the source of plaintiff's claimed breathing trouble was psychological, not physical. Plaintiff has not introduced evidence that creates a question of fact on these matters. Plaintiff cannot prevail on his Eighth Amendment claims arising out of the alleged chemical exposure incident on July 2, 2015.

### iv. Qualified immunity on Eighth Amendment claims

In analyzing whether a prison official is entitled to qualified immunity, the Court asks "whether a constitutional right would have been violated on the facts alleged" and "whether the right at issue was clearly established at the relevant time." *Plumhoff v. Rickard*, 134 S.Ct. 2012, 2020 (2014). The Court finds there is no genuine issue of material fact that defendants did not violate plaintiff's Eighth Amendment rights by exhibiting deliberate indifference to his medical needs in connection with the March 2015 wrist fracture and resulting symptoms and complications, by using force against him during the medical examination on March 9, 2015, or by deliberately exposing him to a toxic chemical agent on July 2, 2015 and refusing to treat a serious medical need resulting from that incident. Defendants are therefore entitled to qualified immunity and to summary judgment on plaintiff's Eighth Amendment claims insofar as plaintiff sues defendants in their individual capacities.

### D. First Amendment Retaliation Claims

Plaintiff claims that defendants SOCF Deputy Warden of Operations Cool, mail room supervisors Frazie and Whitman, mail room attendants Mead and Satterfield, and unidentified state officials violated his First Amendment rights by retaliating against him for "the pursuit in the underlying constitutional violations and deprivations" through a campaign of harassment that involved tampering with and mishandling his mail. (Doc. 1-3 at 10-22; Fourth cause of action). Plaintiff claims that he engaged in protected conduct by successfully appealing to the Ohio Department of Rehabilitation and Correction Chief Inspector an unfavorable disposition of a grievance in which he alleged that none of his mail was forwarded to him from June 12 to August 12, 2014 when he was on a "hunger strike" and housed at FMC. (Doc. 87 at 15, citing Exh. M.D.1, Doc. 87 at 40). On January 15, 2015, the Chief Inspector reversed the Institutional Inspector's denial of plaintiff's grievance, finding that "[p]rovisions should have been made to

forward your mail to FMC based on the circumstances." (*Id.* at 40). Plaintiff claims that after the Chief Inspector's decision, defendants engaged in a series of adverse actions against him by withholding his mail for periods ranging from 4 to 13 days and, in one instance, 80 days; withholding legal books for two months; opening confidential legal mail outside of plaintiff's presence on two occasions; withholding an order issued by this Court in Case No. 14-cv-199 for approximately two weeks; belatedly returning a legal request made to the prison legal clinic; confiscating a document from a withheld parcel without notice; and confiscating a book plaintiff had received because the book exceeded a certain length and width. Plaintiff alleges defendants committed these 22 acts of misconduct related to his mail:

1. From June 12 to August 12, 2014, the "Listed Defendants and responsible state officials refused to forward all of [his] mail" to him from SOCF to a medical facility where plaintiff was housed due to a "hunger strike."

2. Mail from this Court that was postmarked February 5, 2015 was withheld and was not received by plaintiff until February 16, 2015.

3. In February 2015, plaintiff did not receive any of his magazine subscriptions.

4. In March 2015, plaintiff did not receive any of his magazine subscriptions.

5. On June 19, 2015, plaintiff received confidential legal mail "pertaining to civil litigations" from an attorney at the Ohio Attorney General's Office, which had been "opened up outside of [plaintiff's] presence."

6. On June 19, 2015, plaintiff received confidential "legal mail" from "Georgetown Law," which had been "opened up outside of [his] presence."

7. Mail from this Court post-marked June 17 and June 18, 2015 was withheld and not received by plaintiff until June 23 and June 22, 2015, respectively.

8. Legal books which arrived at SOCF in May 2015 were withheld and not delivered to plaintiff until July 2015.

9. Mail containing an order from this Court in Case No. 1:14-cv-199, which was postmarked June 23, 2015, was withheld and not received by plaintiff until July 6, 2015, which "hindered [his] abilities in litigating."

10. A "legal request" sent by plaintiff to this Court on July 22, 2015 was returned to plaintiff "with an invalid and fraudulently applied 'No known (address)-unable to forward.'"

11. Satterfield "made service" for legal mail from this Court post-marked August 3, 2015 and received by plaintiff on August 17, 2015, which was "opened outside of [plaintiff's] presence."

12. On August 21, 2015, plaintiff received a "returned legal request made to 'Prisoners Self-Help Legal Clinic,'" which plaintiff had sent several months earlier on November 5, 2014.

13. Defendant Mead was responsible for withholding a "legal parcel" pertaining to Case No. 1:14-cv-199, which contained correspondence postmarked August 21, 2015 from an attorney at the Ohio Attorney General's Office and was sent to plaintiff vis "UPS Next Day Air," but was not received by plaintiff until August 25, 2015.

14. In September 2015, plaintiff was refused the "requested service of certified mail."

15. On October 13, 2015, plaintiff received "legal mail from the Organizations of American States (O.A.S.) Inter American Commission on Human Rights," which had been "opened up outside of [his] presence."

16. In October 2015, plaintiff received a notice of confiscation of a book that had been sent to him "due to the book's dimension being greater" than a specified length and width.

17. On November 9, 2015, plaintiff received a "confidential legal mail" from an attorney pertaining to a criminal prosecution in Scioto County, which had been "opened up outside of plaintiff's presence."

18. On December 1, 2015, plaintiff received a parcel postmarked November 20, 2015, which not only had been withheld but also was missing a document that had been confiscated without any notification.

19. Three parcels were withheld from plaintiff in December 2015: a parcel postmarked December 8, which plaintiff received on December 17; correspondence received from this Court postmarked December 9, which plaintiff received on December 21; and "legal mail" postmarked December 7, which plaintiff received on December 22.

20. Plaintiff did not receive "legal literature" which was sent on September 15, 2015, until December 4, 2015.

21. In January, when plaintiff was on a "hunger strike," he did not receive any of his subscriptions or "serviced mail" because his mail was rerouted to the "wrong housing unit locations."

22. In November 2015, an over 30-page complaint that plaintiff had drafted and sought to have served on this Court was destroyed in violation of his right of access to the courts and he was "forced to re-draft the entire civil complaint."

(Doc. 1-3 at 15-22). Plaintiff claims that each of the specific acts of mail tampering or mishandling which occurred after January 15, 2015 was taken in retaliation for the favorable decision he obtained from the Chief Inspector.

Defendants Cool, Whitman and Frazie argue they are entitled to summary judgment on plaintiff's retaliation claims based on these incidents because plaintiff seeks to hold them liable in a supervisory capacity under the doctrine of respondeat superior, which is not a basis for liability under 42 U.S.C. § 1983. (Doc. 67 at 47-49). Further, all defendants named in this count argue that they are entitled to summary judgment on plaintiff's First Amendment claim because there is no evidence that any of the incidents of mail withholding or mishandling were acts of retaliation that any defendant took against plaintiff. (*Id.* at 49-56).

A prisoner's claim of retaliation for engaging in protected conduct is grounded in the First Amendment. *Jones v. Caruso*, 421 F. App'x 550, 553 (6th Cir. 2011) (citing *Thaddeus-X v. Blatter*, 175 F.3d 378, 388 (6th Cir. 1999) (en banc)). A retaliation claim has three elements: (1) the prisoner engaged in protected conduct; (2) an adverse action was taken against the prisoner that "'would deter a [prisoner] of ordinary firmness from continuing to engage in that conduct'"; and (3) the prisoner's protected conduct motivated the adverse action, at least in part. *Id.* (quoting *Thomas v. Eby*, 481 F.3d 434, 440 (6th Cir. 2007) (in turn quoting *Thaddeus-X*, 175 F.3d at 394).

Plaintiff's filing of a successful grievance appeal is sufficient to satisfy the protected activity prong of his First Amendment retaliation claim. However, plaintiff has not produced sufficient evidence to show that defendants, with the exception of defendant Mead, took an

adverse action against him, or that there was a causal connection between his protected activity and some adverse action.

Aside from the one instance involving defendant Mead in August 2015, plaintiff has failed to present any evidence showing how any of the other named defendants were personally involved in the withholding or delays of his mail. To establish liability under Section 1983 against an individual defendant, a plaintiff must plead and prove that the defendant was personally involved in the conduct that forms the basis of his complaint. *Greene v. Barber*, 310 F.3d 889, 899 (6th Cir. 2002). *See also Hardin v. Straub*, 954 F.2d 1193, 1196 (6th Cir. 1992) (individual capacity claims must show personal involvement of the defendant who caused the plaintiff's injury). Plaintiff has named defendants Cool, Frazie, and Whitman in connection with their supervisory roles over the mail department. He has failed to present any evidence showing their personal involvement in any of the alleged acts involving plaintiff's mail. In addition, plaintiff alleges that defendant Satterfield "made service" for one piece of legal mail that was opened outside plaintiff's presence, but there is no evidence that Satterfield opened the mail. While plaintiff alleges that defendant Mead withheld legal mail for four days in August 2015, plaintiff has not produced evidence to show that any other defendant tampered with or mishandled plaintiff's mail so as to satisfy the adverse action prong of a retaliation claim. Therefore, plaintiff has failed to establish his First Amendment retaliation claim against these defendants.

In addition, plaintiff has failed to present evidence establishing a genuine issue of fact on the third element of his retaliation claim which requires a causal connection between the protected conduct and the adverse action—"that is, the adverse action was motivated at least in part by the plaintiff's protected conduct." *Thaddeux-X*, 175 F.3d at 394. The Sixth Circuit has

30

held that temporal proximity between protected conduct and retaliatory acts may create an inference of retaliatory motive. *Maben v. Thelen*, 887 F.3d 252, 268 (6th Cir. 2018) (issuance of misconduct ticket *"immediately"* after prisoner complained about inadequate food portions and as prisoner was trying to remedy situation with another official created "suspicious temporal proximity") (emphasis in the original) (citing *King v. Zamiara*, 680 F.3d 686, 695-96 (6th Cir. 2012)). However, "conclusory allegations of temporal proximity are not sufficient to show a retaliatory motive." *Skinner v. Bolden*, 89 F. App'x 579, 579-80 (6th Cir. 2004). *See also Harbin v. Rutter*, 420 F.3d 571, 580 (6th Cir. 2005) (more than "conclusory allegations of retaliatory motive 'unsupported by material facts'" are required to establish a First Amendment retaliation claim) (quoting *Gutierrez v. Lynch*, 826 F.2d 1534, 1538–39 (6th Cir. 1987)).

Plaintiff has failed to create a genuine issue of material fact on the third element of his retaliation claim. Plaintiff alleges that "these events began after I received a decision from the Chief Inspector granting my grievance on the mail room. . . . After this decision I began to encounter a barrage of harassing reprisals in a campaign of retaliations, as listed. . . ." (Doc. 87 at 19). Aside from these conclusory allegations, plaintiff has put forth no evidence showing a causal connection between his protected activity of filing a successful grievance appeal and the numerous actions involving his mail. The instances of alleged mail withholding or delays are simply too remote in time to establish the third element of a retaliation claim. *Vaughn v. Robb*, No. 1:11-cv-323, 2012 WL 769481, at *4 (W.D. Mich. Feb. 17, 2012), *adopted*, 2012 WL 772453 (W.D. Mich. Mar. 8, 2012) (citing cases where even three weeks between the protected conduct and alleged adverse action was too remote in time to establish a causal connection for a claim of retaliation). Plaintiff has not produced evidence to show that many of the incidents that

he characterizes as "mail tamperings" were anything other than either the usual time lapses between mailing and receipt of a document or clerical errors.

Moreover, the Sixth Circuit has directed courts to look at the "totality of the circumstances to determine whether an inference of retaliatory motive can be drawn." *Vereecke v. Huron Valley Sch. Dist.*, 609 F.3d 392, 401 (6th Cir. 2010). Here, there is a lack of temporal proximity and a lack of any other circumstances to suggest a causal connection between plaintiff's filing of a successful grievance appeal and the alleged problems with his mail. Plaintiff has not presented any evidence to suggest that defendant Mead delayed plaintiff's legal mail for four days in August 2015 because he was motivated by plaintiff's successful grievance appeal some *eight months prior*. In essence, plaintiff claims that every action involving his mail after January 15, 2015 constitutes retaliation and was undertaken in response to his successful grievance appeal. Plaintiff's conclusory allegations of retaliatory motive is unsupported by material facts and do not demonstrate a chronology of events from which retaliation may inferred. *See Harbin*, 420 F.3d at 580. *Cf. Whiteside v. Collins*, No. 2:08-cv-875, 2009 WL 4281443, at *9 (S.D. Ohio Nov. 24, 2009) (finding the plaintiff's retaliation claim was subject to dismissal, noting that "conclusory allegations of retaliatory motive and temporal proximity alone are insufficient to establish his retaliation claim") (Report and Recommendation), *adopted*, 2010 WL 1032424 (S.D. Ohio Mar. 17, 2010). To survive summary judgment, plaintiff must do more than simply claim that every time his mail was delayed or handled improperly the incident was an act of retaliation taken by some individual in the mailroom or a supervisor of that individual in response to plaintiff's act of filing the successful appeal to the Chief Inspector. Plaintiff must introduce evidence to demonstrate a causal connection between his protected activity and these incidents, which he has failed to do. Other than the fact that these incidents all pertain to

plaintiff's mail, there is no apparent connection between the incidents and plaintiff's protected conduct. Plaintiff has not introduced any evidence to tie these incidents together and back to his successful grievance appeal.

Accordingly, because plaintiff has failed to demonstrate the requisite causal connection between his protected conduct of appealing a grievance denial and the alleged instances of mail delays or withholding, defendants are entitled to qualified immunity and to summary judgment on plaintiff's First Amendment claims.[1]

## IT IS THEREFORE RECOMMENDED THAT:

1) Defendants' motion for summary judgment (Doc. 67) be **GRANTED**.

2) Plaintiff's motion for leave to file a response that exceeds 20 pages (Doc. 86) be **GRANTED**.

3) Defendants' motion to strike non-comporting declarations submitted in opposition to their motion for summary judgment (Doc. 92) be **DENIED** as moot.

4) Defendants' motion to strike plaintiff's response to defendants' reply (Doc. 94) be **GRANTED**.

5) The Court certify pursuant to 28 U.S.C. § 1915(a)(3) that for the foregoing reasons an appeal of any Order adopting this Report and Recommendation would not be taken in good faith.

---

[1] To the extent that plaintiff may intend to bring a First Amendment claim in connection with his allegations that he experienced difficulty accessing his legal materials, he must demonstrate that the lack of legal materials or the shortcomings in the prison legal assistance program have hindered, or are presently hindering, his efforts to pursue a nonfrivolous legal claim. *Lewis v. Casey*, 518 U.S. 343, 351-55 (1996); *see also Pilgrim v. Littlefield*, 92 F.3d 413, 416 (6th Cir. 1996). "Examples of actual prejudice to pending or contemplated litigation include having a case dismissed, being unable to file a complaint, and missing a court-imposed deadline." *Harbin-Bey*, 420 F.3d at 578. Plaintiff has failed to present evidence supporting a First Amendment denial of access to the courts claim.

*See McGore v. Wrigglesworth*, 114 F.3d 601 (6th Cir. 1997).

Date: _8/13/18_

Karen L. Litkovitz
United States Magistrate Judge

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

JEREMY P. GALLANT,
Plaintiff

Case No. 1:16-cv-00487

Barrett, J.
Litkovitz, M.J.

vs.

ANTHONY CADOGAN, et al.,
Defendants.

## NOTICE

Pursuant to Fed. R. Civ. P. 72(b), **WITHIN 14 DAYS** after being served with a copy of

the recommended disposition, a party may serve and file specific written objections to the

proposed findings and recommendations. This period may be extended further by the Court on

timely motion for an extension. Such objections shall specify the portions of the Report objected

to and shall be accompanied by a memorandum of law in support of the objections. If the Report

and Recommendation is based in whole or in part upon matters occurring on the record at an oral

hearing, the objecting party shall promptly arrange for the transcription of the record, or such

portions of it as all parties may agree upon, or the Magistrate Judge deems sufficient, unless the

assigned District Judge otherwise directs. A party may respond to another party's objections

**WITHIN 14 DAYS** after being served with a copy thereof. Failure to make objections in

accordance with this procedure may forfeit rights on appeal. *See Thomas v. Arn*, 474 U.S. 140

(1985); *United States v. Walters,* 638 F.2d 947 (6th Cir. 1981).